UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

CAERUS CORP., doing business as
Orthocor Medical,

Case No. 23-CV-2624 (PJS/DLM)

Plaintiff,

ORDER

v.

ICON MEDICAL, LLC,

Defendant.

---

David Clifford Archer and Amy Elizabeth Erickson, LATHROP GPM LLP,
for plaintiff.

Matthew J.M. Pelikan and Cassandra B. Merrick, MADEL PA, for
defendant.

Plaintiff Caerus Corp. ("Caerus") distributed medical devices for resale to

defendant ICON Medical, LLC ("ICON") under a poorly drafted "Distributor/Reseller

Agreement" (the "Reseller Agreement"). The parties later purported to enter into a

"Credit Agreement," which was neither reduced to writing nor signed, and whose

terms can be discerned (if at all) only by parsing a handful of ambiguous emails. The

Credit Agreement (if it exists) may or may not have modified the Reseller Agreement.

Caerus brought this breach-of-contract action against ICON, alleging that ICON

failed to pay for medical devices that it received from Caerus. Both parties have moved

for summary judgment. Both parties' motions are (mostly) denied.

## I.  BACKGROUND

Caerus designs and manufactures medical devices.  Kramer Dep. 18:3–16, ECF No. 44-2.  On March 21, 2022, Caerus entered into the Reseller Agreement with ICON, a company that fills medical-device prescriptions for patients.  Reseller Agmt., ECF No. 38-1; Cross-Riley Dep. 18:22–19:11, ECF No. 44-3; Moore Dep. 21:1–12, ECF No. 44-1.  Under the Reseller Agreement, Caerus granted ICON a revocable license to resell its medical devices to patients in Nevada.  Reseller Agmt. § 1.1.  ICON paid Caerus a fixed price for each medical device and retained as profit the difference between what it paid Caerus and what it collected from the patient.[1]  Reseller Agmt. § 3.1.

The Reseller Agreement imposed "90 day terms"—meaning that, after Caerus shipped a product to ICON in fulfillment of a purchase order, ICON would have 90 days to pay for that product.  Reseller Agmt. § 3.1, Ex. C; Kramer Dep. 34:21–24, 37:11–18; Moore Dep. 50:3–6.  If ICON was delinquent in its payments, Caerus had the right to refuse, cancel, or delay any additional shipments.  Reseller Agmt. § 3.3.

---

[1]ICON's business model involves providing patients with medical devices for which ICON does not get paid unless and until the patients recover on personal-injury claims—a period that typically ranges from a few months to many years.  Moore Dep. 26:11–27:18.  As a result, ICON must often wait a long time before it gets paid by a patient.  ICON could generate cash by selling accounts receivable to financing companies for about 25% of the amounts owed, Moore Dep. 28:7–29:19, 35:12–13, but ICON cannot afford to sell its receivables at such a steep discount, Cross-Riley Dep. 50:2–22.

Further, Caerus had the right to charge interest—inexplicably, the Reseller Agreement does not say *how much*[2]—on balances that were more than 60 days past due. Reseller Agmt. § 3.3. A balance became 60 days past due on the 150th day after the date of shipment.[3]

At first, Caerus shipped and ICON paid according to the terms of the Reseller Agreement, but ICON soon started to miss payments, and by August 2022, ICON owed Caerus a significant balance. Am. Compl. ¶¶ 27–28, ECF No. 7; Answer ¶¶ 27–28, ECF No. 25. On August 24, 2022, the CFO of Caerus (Brad Kramer) sent an email to ICON[4] "to put a specific program in place to make it somewhat palatable that we are carrying as much as ~$300,000 of your inventory on our books as receivables." Credit Agmt. 3, ECF No. 38-2; Kramer Dep. 16:17–18. Caerus proposed imposing what it called a "credit limit" of $250,000 on ICON's account and charging 0.8% interest per month (9.6% per annum) "on balances at 91 days or longer." Credit Agmt. 3. Caerus's

---

[2]Caerus had a practice of charging an interest rate of 1.5% per month (18% per annum) on delinquent accounts. Kramer Decl. ¶ 10.

[3]Caerus always shipped and invoiced on the same date. Kramer Dep. 37:11–18.

[4]Kramer emailed Roger Riley, who formerly worked as an independent contractor for Caerus, and who was married to ICON co-owner Jaime Cross-Riley. Riley had introduced Caerus to ICON, but he had no ownership or management role at ICON, and he was never paid by ICON. Moore Dep. 39:20–40:6; Cross-Riley Dep. 33:19–34:16.

proposal provided that the "agreement will be in place unless cancelled by either party in writing." *Id.*

ICON was amenable to most of the terms of the proposed agreement, but asked that the "$250,000 cap" apply only to balances "over 90 days," because "a total cap doesn't really work for us." Credit Agmt. 2. Kramer responded that Caerus would "move forward with my proposal, with the exception of moving the credit limit to $300K," and assured ICON that "we can always discuss as circumstances change." Credit Agmt. 2. On August 26, 2022, ICON accepted the proposal, and the Credit Agreement went into effect. Credit Agmt. 2.

Within weeks, ICON exceeded the $300,000 credit limit—i.e., it owed Caerus more than $300,000 for products that Caerus had shipped to ICON. Kramer Dep. 55–57. Caerus temporarily stopped shipping products to ICON, but then agreed to raise ICON's credit limit to $350,000. *Id.* Between August 2022 and March 2023, Caerus filled ten purchase orders from ICON.[5] Am. Compl. ¶¶ 30–31; Answer ¶¶ 30–31. In December 2022, ICON made a series of payments totaling $115,000 towards its outstanding balance. Moore Decl. Ex. 4, ECF No. 45-4. ICON next paid Caerus $18,725.12 in February 2023. *Id.*

---

[5]The record does not disclose when these orders were placed, the dollar amounts involved, when the products were shipped, or when payments (if any) were made on the orders.

Caerus shipped products to ICON for the last time in late March 2023. Kramer Dep. 30:5–9. On April 17, 2023, the CEO of Caerus (Fariborz Boor Boor) emailed ICON's owners to establish "some sort of payment schedule to satisfy the $350,000 currently owed to us by ICON." Moore Decl. Ex. 2, ECF No. 45-2; Kramer Dep. 57:17–22. ICON made no further payments until June 13, 2023, when it paid $10,000 towards its approximately $350,000 balance. Moore Decl. Ex. 4. ICON paid another $10,000 on July 13, 2023. *Id.*

On August 17, 2023, Boor Boor emailed ICON's owners threatening legal action unless ICON committed to paying at least $50,000 per month toward what was then ICON's $335,103 balance. Moore Decl. Ex. 3, ECF No. 45-3. Boor Boor also offered to reduce ICON's debt to $300,000 and to stop charging interest on the outstanding balance. *Id.* That overture was apparently unsuccessful, as Caerus commenced this action on August 25, 2023. *See* Compl., ECF No. 1.

Since being sued, ICON has made monthly $10,000 payments to Caerus. Moore Decl. Ex. 5, ECF No. 45-5. On or about September 27, 2023—for the first and last time—Caerus sent ICON a receipt for a $10,000 payment that included language reserving the right to demand payment in full and disclaiming any waiver of rights. Archer Decl. Ex. D, ECF No. 39-4; Moore Decl. Ex. 5. Caerus also began charging 1.5% interest per month on ICON's outstanding balance. Kramer Dep. 65–69. As far as

the Court knows, ICON has continued to make $10,000 monthly payments throughout

this litigation.

## II.  ANALYSIS

### A.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it could affect the outcome

of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A dispute of fact is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Id.*  A court must construe the

evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### B.  Payment Terms

The parties do not dispute that ICON owes a lot of money to Caerus.  Rather, the

parties dispute *when* ICON must repay that money.  Resolving that dispute requires a

determination about the effect of the Credit Agreement on the Reseller Agreement.

Caerus contends that the Credit Agreement does not modify the payment terms

of the Reseller Agreement.  Under those terms, ICON must pay for a product within

90 days after Caerus ships that product.  According to Caerus, the Credit Agreement

merely provides a "cap" on how much product ICON can purchase *subject to* the 90-day terms of the Reseller Agreement.

ICON, by contrast, argues that the Credit Agreement *does* modify the payment terms of the Reseller Agreement. Specifically, ICON contends that the Credit Agreement superseded the 90-day terms provided under the Reseller Agreement and replaced those terms with a "line of credit." Thus, ICON can run its balance up to the amount of the line of credit—say, $350,000—but, once ICON hits its credit limit, ICON cannot order more products until it pays down its balance. If ICON pays down its balance to, say, $320,000, then it can order up to $30,000 in new products on credit.

Under Minnesota law, courts first look at the contract's language to attempt to determine the objective intent of the parties. *Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 916 (8th Cir. 2013). "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation." *Id.* (quoting *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997)). If a court determines that a contract is ambiguous, the court may admit extrinsic evidence of the parties' intent. *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018) (citations omitted). "When extrinsic evidence has been admitted, the interpretation of ambiguous terms becomes a question of fact for the jury." *Id.* (citations omitted).

Here, little of the parties' agreement is clear, except that ICON owes Caerus the entire unpaid principal balance plus 0.8% monthly interest on balances carried over 90 days. Caerus's attempt to apply a 1.5% monthly interest rate to the outstanding principal violates the plain language of the Credit Agreement, which sets the interest rate at 0.8% on all balances over 90 days. Likewise, ICON's argument that the Credit Agreement cannot be cancelled except by mutual assent is without merit. The plain language of the Credit Agreement allows for unilateral cancellation by either party.[6] Beyond those two matters, the Court has no idea how the Credit Agreement was intended to fit with the Reseller Agreement.

To start, the emails that (according to the parties) created the Credit Agreement say nothing whatsoever about repayment terms. In his email, Kramer did make a passing reference to the Reseller Agreement's 90-day terms, but he did so only in pointing out to ICON that Caerus had been treating it more favorably than other distributors. *See* Credit Agmt. 3 ("First, understand that you are the only distributor in our system that has been granted 90-day terms. All of our other distributors are operating within 60 days."). Ninety-day terms were never mentioned by the parties in

---

[6]The Court does not understand why Caerus has not simply cancelled the Credit Agreement. If Caerus cancels the Credit Agreement, then the Reseller Agreement will be the only operative contract, and the Reseller Agreement unambiguously allows Caerus to demand full payment of any amount due after 90 days, as well as to impose whatever interest rate it chooses at the 150-day mark.

the course of negotiating what would become the Credit Agreement.  If the parties intended the Credit Agreement to abrogate the 90-day terms of the Reseller Agreement and establish a line of credit, then the failure of the parties to mention the 90-day terms—and their failure to explicitly replace them with new terms—would be rather glaring omissions.  In fact, those omissions might make the Credit Agreement unenforceable for lack of essential terms.[7]  That said, the Credit Agreement does use the word "credit," which obviously suggests that Caerus was extending credit to ICON and not merely limiting how much product ICON could order subject to the 90-day terms of the Reseller Agreement.

The agreements have other problems.  For instance, Caerus clearly had the right under the Reseller Agreement to stop shipping products if ICON failed to pay an amount due by the 90th day.  The Credit Agreement could have been intended to modify that term so that Caerus would be obligated to continue shipping products to ICON—even if ICON was overdue on a payment—up to the amount of the "credit limit."  Alternatively, the Credit Agreement could have been intended merely to

---

[7]*See, e.g., Fairfield Six/Hidden Valley P'ship v. Resolution Tr. Corp.*, 860 F. Supp. 1085, 1089–90 (D. Md. 1994) ("Courts throughout the country have repeatedly refused to enforce loan agreements that are missing terms such as the amount of money to be lent, the interest rate to be charged, the mode of repayment, when the repayments were to commence or end, the amount of periodic payments, and the nature of the security." (citations omitted)).

supplement that term by giving Caerus the right to stop shipping products once ICON hit a total cap on outstanding purchase orders, whether or not ICON was in arrears.

Another problem: The Credit Agreement explicitly gave Caerus the right to charge interest on balances carried 91 days or longer. ICON cites this as evidence that the Credit Agreement was intended to supersede the 90-day terms. If payment was still due in full in 90 days, asks ICON, why would the Credit Agreement give Caerus the right to charge interest after 90 days? In other words, payments later than 90 days seem to be anticipated by the Credit Agreement.

Caerus responds that just because a contract authorizes a seller to charge interest on late payments does not mean that the payments are not *late*—i.e., still due and payable as specified in the contract. As Caerus points out, the Reseller Agreement gave it the right to charge interest on balances that it had carried for more than 150 days, and yet the parties understood that, under that same Reseller Agreement, payments were due in 90 days.

Both parties' interpretations are reasonable, and thus the Court holds that the parties' two agreements—the Reseller Agreement and the Credit Agreement—are ambiguous with respect to when payment is due and owing on the $350,000 "credit line."

The extrinsic evidence does not allow the Court to resolve that ambiguity as a matter of law.  In deposition testimony, the parties' corporate representatives largely parroted their litigation positions.  Kramer, on behalf of Caerus, testified that the purpose of the Credit Agreement was to limit "the maximum amount of exposure that I would expose the company to in allowing carrying a balance for an account," but that the balances remained due "90 days from whenever the shipments occurred."  Kramer Dep. 43:21–44:24.  Moore, on behalf of ICON, opined that the $350,000 "would be paid in accordance with what we could pay" and that "I don't know when we're obligated to pay it.  It's ambiguous."  Moore Dep. 59:12–15, 65:16–18.  Cross-Riley, meanwhile, seemed to be under the impression that the Credit Agreement did not modify the 90-day terms under the Reseller Agreement, but her deposition testimony makes clear that she had little involvement with ICON's finances or its relationship with Caerus.  Cross-Riley Dep. 43:5–44:10, 53:21–54:23.

Other extrinsic evidence is similarly unilluminating.  In the email exchange that purportedly resulted in the Credit Agreement, the parties used the term "cap" (which is consistent with Caerus's current position) interchangeably with the term "credit limit" (which is consistent with ICON's current position).  Curiously, in the email exchange, it is Caerus that refers to the agreement as a "credit limit" and ICON that refers to the agreement as a "cap"—the opposite of the parties' litigation positions.  ICON asked for

the "cap" to apply only to balances carried over 90 days rather than the total balance. Caerus rejected ICON's proposal, but agreed to a higher total "credit limit." Thus, at the time the agreement was formed, both parties were contemplating that ICON would run significant balances beyond the 90-day payment period.

On top of that, it took ICON only a few weeks to blow through the $300,000 maximum. Caerus responded, not by cutting off shipments, but by raising the maximum to $350,000 to accommodate ICON's business. The evidence in the record suggests that, because ICON needed to keep purchasing products, the parties anticipated that ICON would pay down its maximum from time to time so that it would have room under the maximum to buy new products on credit. In other words, the parties seemed to assume that Caerus would float ICON credit up to the maximum as older balances were paid off in a continuous payment/purchase cycle—a system that would work only if ICON purchased Caerus's products in perpetuity. That said, none of the extrinsic evidence establishes as a matter of law when amounts "borrowed" under the $350,000 "credit limit" were due and owing.[8]

_____

[8]ICON seems to argue that any ambiguity should be construed against Caerus as the drafter of the Credit Agreement. But the Minnesota Supreme Court recently held that "[i]n cases involving parties of relatively equal sophistication and bargaining power," an ambiguous contract is not construed against the drafter unless extrinsic evidence cannot resolve the ambiguity (a question of fact for the jury). *Staffing Specifix*, 913 N.W.2d at 693–94 (faulting jury instructions that did not specify the jury should only construe an ambiguous contract against the drafter after failing to determine the

(continued...)

### C.  Course of Performance

ICON argues that, regardless of whether the Credit Agreement is ambiguous as to the payment terms, the parties' subsequent course of performance established a payment plan of $10,000 a month.  A course of performance is relevant to ascertaining the meaning of a contract and "may supplement or qualify the terms of the agreement" if the agreement "involves repeated occasions for performance by a party" and "the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection."  Minn. Stat. § 336.1-303(a), (d).

The parties entered into the Credit Agreement on August 26, 2022.  ICON apparently did not make a payment under the agreement until December 5, 2022, when it paid $15,000.  ICON then made four separate payments on December 19, 2022, totaling $100,000.  The next payment did not arrive until February 10, 2023, when ICON paid $8,832.60.  ICON made a final payment of $9,892.52 on February 27, 2023—the last before Caerus's final shipment to ICON on March 22, 2023.[9]  On April 17, 2023, Caerus emailed ICON to attempt to set up a payment plan for the outstanding balance.  After

---

[8](...continued)
parties' intent by a preponderance of the evidence using extrinsic evidence).

[9]ICON quit ordering from Caerus after Caerus informed ICON that it would no longer fill its purchase orders.  Kramer Dep. 30:15–19.

Caerus's email, ICON made $10,000 payments in June and July 2023 before Caerus once again emailed to set up a payment plan in August.[10]

In sum, ICON made a few scattered payments[11] before Caerus complained, and then made $10,000 payments in each of the two months leading up to the filing of this lawsuit, after which Caerus continued to complain and then sued. True, Caerus allowed ICON to exceed the "cap" or "credit limit" almost immediately and abided months-long periods of nonpayment. But even if Caerus's repeated attempts to set up a payment plan did not constitute a seasonable "objection" to ICON's performance, ICON's history of "pay whatever, whenever" is not sufficiently definite for the Court to conclude as a matter of law that the course of performance clarified or supplemented the terms of the Credit Agreement.

### D. Waiver

Finally, ICON contends that Caerus waived any right to claim payment in full after 90 days and waived any objection to the monthly $10,000 installment payments on ICON's outstanding balance. "Waiver is the intentional relinquishment of a known

---

[10]The payments that ICON made *after* it was sued are irrelevant in determining whether a course of performance supplemented the terms of the Credit Agreement *before* Caerus filed this lawsuit.

[11]Because there is no record evidence of when the purchase orders were shipped, the Court cannot even say for certain that these partial payments were *not* made within 90 days, though the parties do not seem to dispute the issue.

right." *Residential Funding*, 725 F.3d at 918 (quoting *Frandsen v. Ford Motor Co.*, 801

N.W.2d 177, 182 (Minn. 2011)).  The party raising waiver has the burden to show

(1) knowledge of the right and (2) intent to waive that right.  *Id.* (citing *Stephenson v.

Martin*, 259 N.W.2d 467, 470 (Minn. 1977)).  "Intent to waive may be inferred from

conduct but Minnesota courts will not find waiver absent a clear intention to do so, or

facts from which waiver is necessarily implied."  *Id.* (cleaned up).  "When a party acts in

a way that is inconsistent with the terms of a contract, a fact finder can reasonably

conclude that a party waived those contractual provisions."  *Valspar Refinish, Inc. v.

Gaylord's, Inc.*, 764 N.W.2d 359, 367 (Minn. 2009) (citations omitted).  Waiver is generally

a question of fact for the jury.  *Id.*

As a preliminary matter, Caerus argues that it could not have waived its rights

under the contract because the Reseller Agreement contains a nonwaiver provision.

Under Minnesota law, however, a nonwaiver provision may be waived just like any

other provision.  *See, e.g., Slidell, Inc. v. Millennium Inorganic Chem., Inc.*, 460 F.3d 1047,

1055 (8th Cir. 2006) ("Minnesota courts have held that despite a contract's requirement

that a waiver be in writing, certain provisions of the contract may be waived even if

they are not in writing." (citations omitted)); *Pollard v. Southdale Gardens of Edina Condo.

Ass'n.*, 698 N.W.2d 449, 453 (Minn. Ct. App. 2005) ("Because a nonwaiver clause may be

modified by subsequent conduct, the mere presence of a nonwaiver clause does not automatically bar a waiver claim." (citations omitted)).

As to the merits, the Court cannot hold as a matter of law that Caerus waived the right to payment in full after 90 days by accepting partial payments on ICON's outstanding balance or by failing to expressly reserve rights every time it accepted a payment. In accepting partial payments from ICON, Caerus did not "act in a way that is inconsistent with the terms of a contract." To the contrary, Caerus's acceptance of payments from ICON—even if not in the full amount believed due—was fully consistent with Caerus's position that ICON owed it a lot of money. The fact that Caerus did not immediately demand payment in full at 91 days on each and every order likewise does not conclusively establish that Caerus intended to waive its right to demand payment in full after 90 days. *See Residential Funding*, 725 F.3d at 918–19 (finding no waiver because plaintiff did not act contrary to the terms of the contract by "declining to pursue a remedy for which the contract allows," and because plaintiff had no reason to waive the contractual right). Further, Caerus had little incentive to relinquish its right to payment on 90-day terms, except that doing so might induce ICON to purchase more products for which it would be unlikely to pay in the foreseeable future. Thus, the Court cannot find that, by accepting partial payments,

-16-

Caerus intentionally relinquished the asserted 90-day terms and its right to demand paid in full.

## III.  CONCLUSION

The parties' cross-motions for summary judgment are granted in part and denied in part as follows:

First, the Court finds that ICON owes Caerus the entire principal balance for all of its purchase orders.

Second, the Court finds that ICON owes interest on the outstanding principal balance at a rate of 0.8% per month (and not a rate of 1.5% per month).

Third, the Court finds that either party may unilaterally terminate the Credit Agreement, thereby leaving the Reseller Agreement as the only contract governing their relationship.

A jury must resolve all other issues.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Plaintiff's motion for summary judgment [ECF No. 36] is GRANTED IN PART and DENIED IN PART.

2.    Defendant's motion for summary judgment [ECF No. 41] is GRANTED IN

PART and DENIED IN PART.

Dated:  June 18, 2025                   /s/ Patrick J. Schiltz
                                          Patrick J. Schiltz, Chief Judge
                                          United States District Court